The CROW TRIBE OF INDIANS; Crow Tribal Gaming Commission; Absaloka Casino Enterprise, Inc.; Clara Nomee; Gavin Jefferson; Henrietta Pretty On Top; Leon Pretty Weasel; Tyrone Ten Bear; and Steven Stevens, Plaintiffs–Appellants,

v.

Marc RACICOT, individually and as Governor of the State of Montana; Janet Jessup, individually and in her capacity as Administrator of the Montana Gambling Control Division; Joseph Mazurek, individually and in his capacity as

---

Attorney General for the State of Montana; Deanne Sandholm, individually and in her capacity as Assistant Attorney General for the State of Montana; Montana Gambling Control Division; and the State of Montana, Defendants–Appellees.

No. 95–35407.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1996.

Decided June 14, 1996.

John Fredericks, III, Fredericks, Pelcyger, Hester & White, Boulder, Colorado, for plaintiffs-appellants.

Clay R. Smith, Solicitor, Attorney General of Montana, Helena, Montana, for defendants-appellees.

Before LAY,* CHOY, and LEAVY, Circuit Judges.

CHOY, Circuit Judge:

This appeal presents a dispute between the Crow Tribe and the State of Montana over the use of mechanical slot machines on the Crow Indian Reservation. The district court granted summary judgment against the Crow Tribe's claim that the Tribe may operate mechanical slot machines on their Reservation. We affirm.

### Statement of the Case

The Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. §§ 2701–2721, provides a comprehensive framework for regulating gaming on Indian land. The IGRA divides Indian gaming into three classes, each subject to varying degrees of tribal, state and federal regulation. Class I gaming is defined as social games for prizes of minimal value, and traditional forms of Indian gaming conducted as part of tribal ceremonies and celebrations. § 2703(6). Class I gaming is within the exclusive jurisdiction of Indian tribes and is not subject to state or federal regulation. § 2710(a)(1). Class II gaming includes bingo and related games. § 2703(7). Class II gaming is within the exclusive jurisdiction of Indian tribes subject only to federal oversight. § 2710(a)(2). Class III gaming, the type of gaming at issue in this appeal, "means all forms of gaming that are not class I gaming or class II gaming." § 2703(8).

Class III gaming activities may be conducted on Indian lands only if (1) authorized

* Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

by a tribal ordinance, (2) located in a state that permits such gaming for any purpose by any person, organization, or entity, and (3) is conducted in conformance with a Tribal–State compact. § 2710(d)(1). The IGRA provides a framework for the negotiation of a compact. If a state fails to enter into negotiations or fails to negotiate in good faith, the IGRA permits a tribe to bring an action in federal court to compel a state to negotiate in good faith. § 2710(d)(7)(A).[1]

In March 1993, the Crow Tribe ("Crow") and the State of Montana ("State") executed a Tribal–State compact authorizing Class III gaming on the Crow Reservation. The Tribal–State compact was approved by the Secretary of the Interior as required by § 2710(d)(8). On January 8, 1994, the Crow Tribal Council adopted the Crow Tribal Gaming Ordinance. Section 10 of the Gaming Ordinance establishes the Crow Tribal Gaming Commission ("Commission") and delegates to the Commission the authority to regulate Class III gaming and to issue regulations implementing that authority. On March 3, 1994, the Commission promulgated regulations governing administrative proceedings relating to Class III gaming. Final decisions of the Commission are appealable to the Crow Tribal Court.

Appellant Absaloka Casino Enterprise, Inc. ("ACE") is a tribally-chartered corporation wholly owned by the Crow. ACE owns and operates the Little Bighorn Casino located within the Crow Indian Reservation.

On April 23, 1994, ACE filed a declaratory judgment action with the Commission. ACE requested that the Commission determine whether mechanical slot machines are authorized under Appendix F of the compact. The Commission set a hearing date for April 29, 1994 and notified the State. The State, through Governor Racicot, chose not to appear at the hearing. Instead, Governor Racicot sent a letter to the Commission stating that the Commission's interpretation of the compact would not be binding on the State.

The Commission held a hearing on ACE's petition on April 29, 1994. On the basis of the evidence presented by ACE, the Commission issued an order declaring that ACE could lawfully operate mechanical slot machines consistent with the IGRA and Appendix F of the compact. Thereafter, Governor Racicot sent a letter dated May 20, 1994, to the Commission stating that the Commission's order was not binding on the State; that the compact does not authorize the use of slot machines; and that the use of slot machines would be a substantial failure by the tribe in its performance under the compact. The State did not seek relief from the Commission's order in the Crow Tribal Court.

ACE began operating mechanical slot machines on June 17, 1994. On the following day, state and federal agents entered the Little Bighorn Casino with a search warrant and seized the slot machines. The search warrant was supported by an affidavit from FBI agent Steven Santala. Santala's affidavit was based on information provided by Janet Jessup, the Administrator of the Montana Gambling Control Division.

The Crow filed suit in district court seeking declaratory, injunctive, and monetary relief under 42 U.S.C. § 1983. The Crow's first, fifth, and sixth causes of action alleged that the State violated the Crow's right to regulate Class III gaming and operate mechanical slot machines. The Crow's second, third, and fourth causes of action alleged that the State violated their Equal Protection, Due Process, and Fourth Amendment rights. The district court granted summary judgment against all of the Crow's claims.

On appeal, the Crow present two bases in favor of the use of mechanical slot machines. First, the Crow argue that the Commission's order collaterally estops the State from maintaining that slot machine use is not permitted. The Crow contend that the order became final when the State failed to appeal to the Tribal Court and respect for tribal self-government prevents relitigation of this

---

1. The Supreme Court recently held that this grant of federal court jurisdiction violates the Eleventh Amendment. *Seminole Tribe of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Because the State and the Crow have already adopted a Tribal–State compact, the specific remedy invalidated by *Seminole Tribe* is not at issue here.

issue in federal court. Second, the Crow argue that even if this issue may be relitigated, slot machines are permitted under the compact. The Crow also appeal the district court's grant of summary judgment against their Fourth Amendment and Due Process claims. The Crow do not appeal the district court's grant of summary judgment against their Equal Protection claim.

■ We review a grant of summary judgment de novo. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## Discussion

A. The State is not estopped from arguing that the compact does not permit the use of mechanical slot machines because the Commission lacks jurisdiction to interpret the Tribal–State compact.

■ If the Commission lacked jurisdiction to interpret the compact to include the use of mechanical slot machines, then its determination cannot have preclusive effect. *See In re Jenson,* 980 F.2d 1254, 1256 (9th Cir.1992).

The compact itself provides little insight into the scope of the Commission's power. Article II of the compact provides:

The purpose of this Agreement is to provide for the operation of and to define the respective authority of the Tribe and the State for regulation of Class III gaming as defined by the IGRA on the Crow Reservation.

The Commission is defined as the agency "responsible for regulatory oversight of gaming under this Agreement," Article III.H, and "regulate" means "the power to control through statute, ordinance, resolution, administrative rule, guideline or administrative procedure and to impose taxes, fees, assessments and penalties insofar as is consistent with the IGRA." Article III.C. Finally, Article IX provides: "The primary responsibility for the on-site regulation, control and security of the gaming operation authorized by this Agreement and for the enforcement of this Agreement shall be that of the [Commission]." While these provisions illustrate that the Commission does have some regulatory power, they do not indicate that such power extends to interpreting the types of gaming permitted under the compact.

The Tribal Gaming Ordinance provides a better understanding of the scope of the Commission's regulatory power. The Gaming Ordinance provides:

The Crow Tribe is authorized to operate, license and regulate Class III gaming on Indian Lands, as defined at 25 U.S.C. § 2703(4)(b) within the State of Montana, provided it has entered into, and operates Class III gaming consistent with, a compact entered into between the Tribe and the State of Montana.

The Ordinance creates the Commission and grants the Commission various powers including the power to: promulgate rules and regulations; identify and define rules of play for each Class III game permitted; license, supervise, inspect, and oversee all gaming activities; conduct background investigations of employees; carry on a continuous study of Class III gaming; report to the Tribal Council on emergencies; and take any action deemed necessary and appropriate to enforce the Ordinance. Notably absent from the powers of the Commission is the authority to determine the types of games the compact permits.

■ A holding that the Commission has jurisdiction to interpret the compact would undermine the express grant of jurisdiction to the United States District Courts to enjoin gaming on Indian lands not permitted under a compact. § 2710(d)(7)(A)(ii) provides: "The United States district courts shall have jurisdiction over ... any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal–State compact." If the Commission could interpret the compact, then once such an interpretation was made and became final after appeal to the Tribal Court, it would not be reviewable in federal court. "Unless a

federal court determines that the Tribal Court lacked jurisdiction, however, proper deference to the tribal court system precludes relitigation of issues raised ... and resolved in the Tribal Courts." *Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 19, 107 S.Ct. 971, 978, 94 L.Ed.2d 10 (1987). Thus, in a case where a tribe's administrative and judicial bodies have interpreted a compact in a manner contrary to a state's position, a state would have no remedy in federal court. This would render the express grant of jurisdiction in § 2710(d)(7) useless.

Article X of the compact also counsels against a holding that the Commission has jurisdiction to interpret the types of permissible gaming. Article X permits termination of the compact in the "event of substantial and continuing failure" by either the State or the Crow in the performance of the obligations under the compact. We agree with the State that allowing the Crow, through the Commission, to have the final word on the interpretation of the compact would render this provision difficult to enforce against the Crow. The parties could not have intended this result.

■ We are not persuaded by the Crow's argument that the exhaustion cases require a holding that the Commission has jurisdiction to interpret the compact. The exhaustion cases express the principle that a "tribal court presumptively has jurisdiction over activities that take place on tribal land." *United States v. Plainbull,* 957 F.2d 724, 727 (9th Cir.1992); *see also Iowa Mutual,* 480 U.S. at 18, 107 S.Ct. at 977–78. Yet, here the issue is not the jurisdiction of a tribal court but rather the authority of a tribal agency. Agencies do not have presumptive jurisdiction like a tribal or state court, but rather have limited jurisdiction. *See Lyng v. Payne,* 476 U.S. 926, 937, 106 S.Ct. 2333, 2340–41, 90 L.Ed.2d 921 (1986) (agency power no greater than that delegated by legislature). Thus, we need not presume that the Commission has jurisdiction to interpret the compact.

In conclusion, we hold that the Commission lacks authority to interpret the compact and thus its order does not estop the State

from arguing that the compact does not permit the use of mechanical slot machines.

**B. The Tribal–State compact does not permit the use of mechanical slot machines.**

The IGRA sets forth three requirements that must be established before Class III gaming activities are lawful on Indian lands. The gaming activities must be: (1) authorized by a tribal gaming ordinance, (2) located in a state "that permits such gaming for any purpose by any person, organization, or entity," and (3) conducted in conformance with a Tribal–State compact. § 2710(d)(1). We address only the third requirement and hold that the compact does not permit the use of mechanical slot machines.

■ Appendix F, the provision authorizing lotteries, provides:

I. *DEFINITIONS*

"LOTTERY GAMES." The term "LOTTERY GAMES" means any procedure, including any on-line or other procedure using a machine or electronic device, by which one or more prizes are randomly distributed among persons who have paid for a chance to win a prize but does not include any game in which a player completes [sic] against or plays with any other person.

II. *CONDITIONS*

Lottery games may be conducted on the Reservation if such games are conducted and operated by the Tribe in a manner which provides security at least as stringent as the Montana Lottery.

The Crow argue that the language of this provision permits the operation of mechanical slot machines. The Crow rely on the expert testimony of James Maida who testified that a lottery encompasses any game with the elements of prize, consideration, and chance. The Crow also rely on several state court cases holding that the term "lottery" includes slot machines. The State responds that throughout the compact negotiations the State repeatedly objected to the use of slot machines; that the Crow agreed to drop slot machines from their compact proposals; and that the term "lottery games" relates only to those forms of gaming allowed under the Montana Lottery.

The State's argument premised on the negotiation of the compact is persuasive. Prior to the execution of the compact, the Crow tendered proposed compacts authorizing a broad range of Class III gaming. The Crow's second proposed compact explicitly authorized the use of mechanical slot machines. "The Tribe may conduct ... slot machines." Joint Exhibit Appendix to Affidavits of Robert J. Robinson and Janet Jessup, Ex. 5, p. 4. Similarly, the Crow's third proposed compact explicitly authorized mechanical slot machines. *Id.*, Ex. 8, p. 5. The State, through its negotiator Robert J. Robinson, objected to both of these compacts. The State asserted that the Crow could only operate those forms of gaming permitted under Montana law and that slot machines were not permitted. *Id.*, Ex. 6, pp. 20, 23; *Id.*, Ex. 7, pp. 3–4; *Id.*, Ex. 10, p. 6. In response to the State's objections, the Crow apparently agreed to exclude mechanical slot machine use from the compact. Tom Fredericks, representing the Crow, stated: "Well, I think that we'd be willing to say okay, we won't have any of the one-armed mechanical bandits in there, the antique kinds of things. We'll just leave it to video machines." *Id.*, Ex. 10, p. 6.

As adopted, the March 1993 compact makes no reference to the use of mechanical slot machines. The only reference to slot machines is in Appendix A which specifically excludes slot machines from the scope of permissible video gambling machines. We agree with the State that it makes no sense to conclude that the parties intended the ambiguous language in Appendix F to authorize mechanical slot machine use when the State and the Crow earlier disputed an explicit authorization.

The State's explanation of the lottery games provision is also persuasive. The State explains that as originally drafted, part II of Appendix F, provided:

II. *CONDITIONS*

*Lottery games may be conducted on the Reservation under the following conditions:*

*A. such games are authorized by the Montana Lottery subject to the provisions of sections 23–7–101 through 23–7–412, MCA;*

*B. such games are conducted and operated by the Tribe in a manner which provides security at least as stringent as the Montana Lottery.*

The State claims that as originally drafted the compact allowed the State to operate the Montana Lottery on the Reservation under section II.A and granted a reciprocal right to the Crow to operate its own lottery under section II.B. The State argues that while the compact as executed omitted the State's right to operate the Montana Lottery on the Reservation under section II.A, the language in section II.B, which is included in the executed compact, was intended to authorize only those forms of gaming permitted under the Montana Lottery.

The State's argument is persuasive considering that Appendix F of the executed compact references the security provisions of the Montana Lottery. The Montana Lottery has no security provisions for the use of mechanical slot machines because slot machines are excluded from the scope of the Montana Lottery. "The state lottery may not ... operate a slot machine." MCA 23–7–102(3)(a). The lack of security provisions for slot machines implies that the compact was not intended to allow their use.

The Crow argue that we should accept the expert testimony that lotteries include all games with the elements of prize, consideration, and chance. We disagree. The interpretation of a contract is an issue of law which this court reviews de novo. *Stoumbos v. Kilimnik,* 988 F.2d 949, 954 (9th Cir.), *cert. denied,* 510 U.S. 867, 114 S.Ct. 190, 126 L.Ed.2d 148 (1993). Expert testimony is not proper for issues of law. "Experts 'interpret and analyze factual evidence. They do not testify about the law....'" *United States v. Brodie,* 858 F.2d 492, 496 (9th Cir.1988) (quoting *United States v. Curtis,* 782 F.2d 593, 599 (6th Cir.1986)).

The Crow also argue that case law strongly supports their position that lotteries include slot machines. *See Harris v. Missouri Gaming Comm'n,* 869 S.W.2d 58, 64 (Mo. 1994) ("Almost all other state courts have held slot machines to be lotteries."). The

Crow present a good argument that lotteries generally include slot machines. Yet, the issue here is not whether lotteries generally include slot machines, but rather whether the parties intended the term "lottery games" in the compact to authorize slot machines. The State persuasively argues that this result was not intended. In conclusion, we hold that the compact does not permit the use of mechanical slot machines.[2]

C. The district court properly granted summary judgment against the Crow's Fourth Amendment claim.

 The Crow explain that their Fourth Amendment claim has two components: (1) that no substantial basis for probable cause could exist to search the casino and seize the slot machines because the use of the slot machines was lawful under the IGRA and the compact, and (2) that the magistrate who issued the search warrant was misled by Janet Jessup's misrepresentations and omissions of fact. Appellant's Opening Brief at 27–28.

We affirm the grant of summary judgment against the Crow's Fourth Amendment claim. A substantial basis for probable cause did exist. As explained above, the Crow have neither the right to interpret the compact nor to operate mechanical slot machines. Under these circumstances, the Johnson Act is applicable and the use of slot machines is illegal. *See* § 2710(d)(6); 15 U.S.C. § 1175. Moreover, we are not persuaded that Janet Jessup omitted or misrepresented any facts. Her conduct was objectively reasonable and she is entitled to qualified immunity. *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

D. The district court properly granted summary judgment against the Crow's Due Process claim.

■ The district court wrote:

Because the compact and the State of Montana do not create an interest in the operation of mechanical slot machines,

plaintiffs do not have a property interest in owning or operating slot machines. Accordingly, they have not suffered a deprivation of that interest at the hands of defendants.

District Court Judgment at 18. We agree with the district court. As discussed above, the Crow have neither the right to interpret the compact nor the right to operate slot machines. Thus, the Crow have failed to establish the necessary predicate for a Due Process claim—the existence of a property or liberty interest.

### Conclusion

We hold that the Commission lacks jurisdiction to interpret the compact and thus its order does not estop the State from maintaining that the compact does not permit the use of mechanical slot machines. We further hold that the Tribal–State compact does not permit the use of mechanical slot machines. Finally, summary judgment was properly granted against the Crow's Fourth Amendment and Due Process claims.

AFFIRMED.

---

**2.** Because we hold that the Commission lacks jurisdiction to interpret the compact and that the compact does not permit the use of mechanical slot machines, we need not decide whether (1) the IGRA creates enforceable rights for purposes of § 1983, (2) the IGRA forecloses § 1983 enforcement, (3) the compact is a "law" of the United States for purposes of § 1983, and (4) the Crow Tribe is a "person" who may sue under § 1983.