**UNITED STATES of America, Plaintiff,**

v.

**1020 ELECTRONIC GAMBLING MACHINES, Defendant.**

No. CS–98–265–FVS.

United States District Court, E.D. Washington.

Jan. 19, 1999.

**1220**

James R. Shively, Thomas O. Rice, Assist. U.S. Attorneys, Spokane, WA, for plaintiff.

Scott D. Crowell, David R. Lundgren, Kirkland, WA, for defendant.

## ORDER GRANTING STAY

VAN SICKLE, District Judge.

**THIS MATTER** came before the Court on December 30, 1998. The Confederated Tribes of the Colville Reservation and the Spokane Tribe of Indians move the Court to stay the judgments entered against them. The Confederated Tribes were represented by Bruce R. Greene and Timothy Brewer; the Spokane Tribe by Scott D. Crowell and David R. Lundgren. The United States was represented by Assistant United States Attorneys James R. Shively. This order serves to memorialize the Court's oral ruling.

### BACKGROUND

The government filed separate actions against the Confederated Tribes of the Colville Reservation and the Spokane Tribe of Indians (hereinafter "Tribes") seeking forfeiture of certain gambling devices pursuant to the Johnson Act, 15 U.S.C. §§ 1171–1178. Separate judgments have been entered against the Tribes requiring them to surrender the gambling devices to the government. The Tribes move the Court to stay the judgments.

### STANDARD

■ The Tribes' bring their respective requests under Federal Rule of Civil Procedure 62(c). The factors traditionally considered in determining whether a stay is available under Rule 62(c) are these: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987).

### LIKELIHOOD OF SUCCESS

Whether the Tribes are likely to succeed on appeal depends upon the answers to a number of questions.

*A. Are Indian tribes subject to the Johnson Act?*

■ The Johnson Act prohibits the possession or use of gambling devices on Indian reservations. 15 U.S.C. § 1175(a). The Ninth Circuit has held that Indian tribes are subject to the Johnson Act. *See Crow Tribe of Indians v. Racicot,* 87 F.3d 1039, 1046 (9th Cir.1996) (*Racicot*). The Tribes argue that *Racicot* is distinguishable, and that the Court erred by failing to follow *Reich v. Great Lakes Indian Fish and Wildlife Commission,* 4 F.3d 490 (7th Cir.1993) (*Reich*). .

In 1993, the State of Montana entered into an agreement with the Crow Tribe under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 et seq. The agreement authorized the Crow Tribe to conduct certain types of gaming on its reservation. *Racicot,* 87 F.3d at 1042. Later, a dispute arose concerning slot machines. When a tribally-chartered corporation began operating such devices in a casino on the reservation, state and federal law enforcement officers entered the casino pursuant to a search warrant and seized the devices. *Id.* The tribe sued the state in federal court alleging that, among other things, the state violated the Fourth Amendment by seizing the slot machines. *Id.* The tribe's Fourth Amendment claim

had two components: "(1) that no substantial basis for probable cause could exist to search the casino and seize the slot machines because the use of the slot machines was lawful under IGRA and the compact, and (2) that the magistrate who issued the search warrant was misled...." *Id.* at 1046. The Ninth Circuit concluded that the tribe was not authorized to operate slot machines. *Id.* Consequently, the circuit court affirmed the district court's decision to dismiss the tribe's Fourth Amendment claim, saying, "The Crow have neither the right to interpret the compact nor to operate mechanical slot machines. Under these circumstances, the Johnson Act is applicable and the use of slot machines is illegal. *See* [25 U.S.C.] § 2710(c)(6); 15 U.S.C. § 1175. Moreover, we are not persuaded that [a state official] omitted or misrepresented any facts." *Racicot,* 87 F.3d at 1046.

The Tribes maintain *Racicot* is limited to situations in which a state (or the United States) is attempting to enforce a valid tribal-state compact. While a compact existed in *Racicot,* that fact should not obscure the larger point: The Ninth Circuit applied the Johnson Act to an Indian tribe, not individual Indians. Thus, the Tribes' assertion that the Johnson Act applies only to individuals—never to Indian tribes as tribes—is inconsistent with this circuit's precedent.

*Reich* arose when the Department of Labor attempted to enforce a subpoena seeking payroll records from the Great Lakes Indian Fish and Wildlife Commission. The Department had served the subpoena in an effort to determine whether the Commission was paying overtime compensation to its wardens as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219. 4 F.3d at 491. Consequently, to understand *Reich,* it is useful to review the FLSA provisions at issue in that case.

The FLSA requires employers to pay overtime to employees who work more than 40 hours per week. 29 U.S.C. § 207(a)(1). Both states and Indian tribes are employers within the meaning of the FLSA. 29 U.S.C. § 203(d), (a). As a result, both are required to comply with FLSA overtime requirements.

Congress has softened the impact of the FLSA on public agencies. While they are not entirely exempt from § 207(a)(1), they enjoy a certain amount of flexibility when it comes to paying overtime to fire fighters and law enforcement officers, 29 U.S.C. § 207(k), and they are entitled to substitute compensatory time for cash compensation in certain circumstances. 29 U.S.C. § 207(*o*).

In *Reich,* one of the questions was whether the Commission was entitled to the benefit of the public-agency "exemptions." The Department said, "No." Noting that the FLSA defines the term "public agency," 29 U.S.C. § 203(x), and that the FLSA definition does not mention Indian tribes, the Department argued that the Commission is not entitled to the benefit of subsection 207(k) and 207(*o*).

The Seventh Circuit was troubled by the Department's interpretation of § 203(x) because it could see no reason to treat tribal wardens differently than state law enforcement officers. Although the Department was literally correct, the Seventh Circuit rejected its interpretation of § 203(x) on the ground it would "create a senseless distinction between Indian police and all other police." 4 F.3d at 494. Instead, the Seventh Circuit concluded that Congress' failure to mention Indian tribes was simply a matter of oversight. *Id.* Citing considerations of comity and tribal sovereignty, the Seventh Circuit rectified the perceived oversight by extending the benefits of subsections 207(k) and 207(*o*) to the Commission's wardens. 4 F.3d at 495–96.

The Tribes seek to invoke the Seventh Circuit's rationale here. In order to do so, they must show that both Indian tribes and states are nominally subject to 15 U.S.C. § 1175(a); that the Johnson Act contains an exemption for states, but not Indian tribes; that the exemption creates

a senseless distinction between states and tribes; and that had Congress considered the issue, it would have extended the exemption to tribes as well as states.

Like the FLSA, both states and Indian tribes are nominally subject to § 1175(a). Unlike the FLSA, however, there are no exemptions to § 1175(a) as it pertains to Indian reservations.[1] No one is permitted to possess or use gambling devices on Indian reservations under any circumstances. Consequently, Indian tribes are treated no differently than anyone else with respect to the regulation of gambling devices on Indian reservations.

The Tribes do not suggest otherwise. Instead, they note that the Johnson Act does not forbid states from possessing gambling devices on non-reservation land. This alleged exemption for states creates a senseless distinction, they submit. A state may authorize the operation of gambling devices on land within its jurisdiction, but an Indian tribe may not authorize the operation of gambling devices on land within its jurisdiction. According to the Tribes, Congress could not have intended such a result.

There are at least two problems with the Tribes' position. One, their proposed "exemption" is not an exemption at all. Two, the distinction of which they complain is one Congress chose to make.

To understand why the Tribes' proposed "exemption" is not an exemption, it is necessary to return to *Reich*. As will be recalled, 29 U.S.C. § 207(a)(1) imposes upon employers a duty to pay overtime. Since subsections 207(k) and 207(*o*) relieve public agencies of that duty, it makes sense to refer to them as exemptions. *See American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 421, 103 S.Ct. 1921, 1932, 76 L.Ed.2d

22 (1983) ("The term 'exemption' is ordinarily used to denote relief from a duty or service.") Thus, to show that 15 U.S.C. § 1175(a) is subject to a *Reich*-like exemption, the Tribes must demonstrate that someone nominally covered by § 1175(a) need not comply with the duties it imposes. Given the facts of this case, that means identifying someone who is authorized to possess or operate gambling devices on Indian reservations. That the Tribes cannot do. As a result, § 1175 is free from the type of ambiguity the Seventh Circuit found in the FLSA.

Moreover, text of the Johnson Act indicates Congress intended to create the distinction of which the Tribes complain. By including one section recognizing the broad of authority of states to permit the possession of gambling devices on non-reservation land,[2] and another section withdrawing from all persons the authority to possess gambling devices on reservation land,[3] Congress made an unmistakable statement: It intended to give states more latitude with respect to gambling devices than it gave to Indian tribes. That interpretation of the Johnson Act is supported by its legislative history. For example, the House Report states:

> The primary purpose of this legislation is to support the policy of those States which outlaw slot machines and similar gambling devices, by prohibiting use of the channels of interstate or foreign commerce for the shipment of such machines or devices into such States. In addition the legislation prohibits the manufacture, sale and use of slot machines and similar devices in those parts of the United States which are under the jurisdiction of the Federal Government.

H.Rep. No. 81–2769, at ____ (1950), *reprinted in* 1950 U.S.C.C.A.N. 4240.

---

1. Section 1175(a) is subject to certain exceptions, 15 U.S.C. § 1175(b), but they are not relevant here.

2. 15 U.S.C. § 1172(a) ("this section shall not apply to transportation of any gambling device to a place in any State which has enacted

a law providing for the exemption of such State from the provisions of this section ...")

3. 15 U.S.C. § 1175(a) ("It shall be unlawful to ... possess, or use any gambling device ... within Indian country as defined in section 1151 of Title 18").

In conclusion, Indian tribes are subject to 15 U.S.C. § 1175(a). *Racicot,* 87 F.3d at 1046. *Reich* is not the law of this circuit. Furthermore, it is distinguishable.

*B. Has the Ninth Circuit effectively instructed the government not to seek forfeiture?*

■ In *United States v. Spokane Tribe of Indians,* 139 F.3d 1297, 1300–01 (9th Cir.1998), the Ninth Circuit concluded that it is unlikely Congress would have enacted IGRA in its present form had it anticipated *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The circuit court implied that the government may not enforce IGRA against Indian tribes unless circumstances have occurred that cause IGRA to function as Congress intended. *Id.* at 1301. Here, however, the government is not seeking to enforce IGRA. Rather, it is seeking forfeiture under the Johnson Act. In *Spokane Tribe,* the circuit court made the following comment about that Act:

> [E]ven if the Tribe did violate the Johnson Act, the two sections enforcing its provisions, 15 U.S.C. §§ 1176 and 1177, call for fines, imprisonment and confiscation of gambling devices as remedies. Neither section provides for injunctions. Moreover, the scope of the injunction here is much broader than the Johnson Act violation, which only concerns gambling *devices.*

*Id.* at 1302 n. 7 (emphasis in original). Neither that comment nor anything else in the circuit court's opinion bars the present forfeiture actions.

*C. Does the government have a duty to sue the State of Washington on the Tribes' behalf?*

■ In *Chemehuevi Indian Tribe v. Wilson,* 987 F.Supp. 804, 809 (N.D.Cal. 1997), Magistrate Judge Zimmerman ruled that the government had a duty to bring an action against the State of California on behalf of an Indian tribe in order to set the IGRA process in motion. The Tribes argue

that this Court erred when it declined to follow *Chemehuevi.*

■ When the government manages a tribal resource, and the government's responsibilities are defined by statute or regulation, a fiduciary relationship arises. *United States v. Mitchell,* 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983) (*Mitchell II* ). The government can be held liable in damages for the breach of its fiduciary duties. *Id.* at 226–27, 103 S.Ct. at 2972–73. However, it is one thing to say the government should be held accountable in damages for decisions it makes when it assumes the role of fiduciary, quite another to say that an Indian tribe may compel the government to take steps the government deems unwise. *See, e.g., Shoshone–Bannock Tribes v. Reno,* 56 F.3d 1476, 1482 (D.C.Cir.1995) ("an Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty").

*Shoshone–Bannock* is instructive in that regard. In that case, an Indian tribe requested, among other things, an order compelling the Attorney General to file claims to certain off-reservation water rights. *Id.* at 1479. The district court denied the request, and the D.C. Circuit affirmed. The circuit court concluded that the tribe had failed to establish either that the Attorney General's decision was reviewable, *id.* at 1481–82 (discussing *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)), or that the government owed the tribe a specific trust duty. *Id.* at 1482–83. The circuit court found support for its conclusion in the government's assertion that the tribe's proposed claims were of questionable merit. *Id.*

Judge Rogers joined Judge Randolph's opinion, but wrote separately to emphasize two points.[4] First, she noted the inverse relationship between the government's trust duties to a particular tribe and the Attorney General's discretion to manage

4. Judge Wald concurred with Judge Rogers.

litigation involving the tribe. *Id.* at 1484. In other words, if the government does not owe a specific trust duty to a tribe, the Attorney General's decision to refrain from instituting litigation on the tribe's behalf is probably unreviewable under *Chaney*. Conversely, to conclude:

> that the Attorney General's discretion is unreviewable under *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), is tantamount in the instant case to a decision that the government's trust obligation lacks the specificity required after *United States v. Mitchell*, 463 U.S. 206, 224–25, 103 S.Ct. 2961, 2971–72, 77 L.Ed.2d 580 (1983) (*Mitchell II* ), and *United States v. Mitchell*, 445 U.S. 535, 542, 100 S.Ct. 1349, 1353, 63 L.Ed.2d 607 (1980) (*Mitchell I* ), to impose an affirmative and enforceable duty.

*Shoshone–Bannock*, 56 F.3d at 1482. Second, Judge Rogers questioned the need to appraise the merits of the tribe's claims. "[T]he court," she said, "has only to evaluate the nature of the government's duty as expressed in the underlying substantive law...." *Id.* at 1484.

In *Chemehuevi*, Judge Zimmerman cited Judge Rogers' concurring opinion for the proposition that the government has a duty to represent an Indian tribe in compelling circumstances. 987 F.Supp. at 808. He concluded that the following circumstances satisfied that standard: The government did not contend the tribe's claim was meritless. The tribe had no legal remedy if the government did not sue the state. A duty to sue could be implied from IGRA, and the government's general trust obligations supported the existence of such a duty. *Id.* at 808–09.

Judge Zimmerman's decision raises a number of questions. First, what is the standard for determining whether a specific fiduciary duty exists? It is not "compelling circumstances." Such a standard cannot be reconciled with *Mitchell II*. As the Ninth Circuit observed recently, "[T]he main reasons for [the Supreme Court's] conclusion [in *Mitchell II* ] were

the specific obligations placed on the government by statutes and regulations, and the fact that the government 'assumed[d] such elaborate control over forests and property belonging to Indians.' " *Morongo Band of Mission Indians v. Federal Aviation Administration*, 161 F.3d 569, 574 (9th Cir.1998). This case, of course, does not involve resource management. In cases such as this, the Ninth Circuit has suggested the threshold inquiry under *Mitchell II* is whether federal statutes or regulations impose a specific duty on the government. *See id.; cf. United States v. Wilson*, 881 F.2d 596, 600 (9th Cir.1989) (per curiam) (citing *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 624 F.2d 981, 988 (Ct.Cl.1980)).

Second, in a case where a tribe is asking the government to file an action, is the merit of a tribe's proposed claim relevant to the *Mitchell* inquiry? In *Shoshone–Bannock*, Judge Randolph indicated that it is. 56 F.3d at 1482. The concurring judges disagreed with him on that point. As noted above, they thought it unnecessary to appraise the merits of the claim. *Id.* at 1484.

Third, can a specific trust duty be implied from the text of IGRA? Judge Zimmerman approached that question by focusing on the problems created by *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). He concluded a duty to sue can be implied since "that is the only legal remedy available to the plaintiff Tribes to seek the benefits Congress intended them to have and to preserve the balance Congress carefully struck between the interests of the states and the tribes." *Chemehuevi*, 987 F.Supp. at 808. With all due respect, the Court disagrees with both Judge Zimmerman's approach to the question and his answer. Given the analytical framework established by *Mitchell II*, the principal inquiry is this: What role did IGRA, as originally written, assign to the Secretary of the Interior? As the Court explained in

more detail in its orders of December 10, 1998, there is nothing in the text of IGRA to suggest that Congress intended the Secretary of the Interior to bring IGRA actions against states. While Congress may not have enacted IGRA in its present form had it anticipated *Seminole Tribe,* Congress has done nothing since that decision to indicate it wants the Secretary of the Interior to be involved in IGRA litigation.

Fourth, can a general trust obligation support the existence of a specific fiduciary duty? It can, but only where there are statutes or regulations that clearly impose such a duty. *Mitchell II,* 463 U.S. at 225, 103 S.Ct. at 2972. By itself, a general trust duty is not enough to establish the existence of a specific duty. *United States v. Mitchell,* 445 U.S. 535, 546, 100 S.Ct. 1349, 1355, 63 L.Ed.2d 607 (1980) (*Mitchell I*).

Having carefully reviewed *Chemehuevi* in light of *Mitchell II* and the Ninth Circuit cases that have interpreted *Mitchell II,* the Court respectfully declines to follow Judge Zimmerman's decision. The standard he employed to determine the existence of a duty to sue is inconsistent with binding precedent. He failed to cite any provision in IGRA that actually imposes upon the Secretary of the Interior a duty to sue recalcitrant states. Finally, one of the considerations he relied upon—*i.e.,* the merit of a tribe's proposed claim—is of questionable relevance in determining whether the Secretary can be compelled to bring an IGRA action.[5]

**IRREPARABLE INJURY TO TRIBES**

■ The Tribes use the proceeds from gambling devices to fund a number of useful programs. If the gambling devices are forfeited, the Tribes will be forced to terminate those programs. That fact is sufficient to create a risk of irreparable harm.

**INJURY TO THE UNITED STATES**

The government will suffer no financial injury if forfeiture is stayed.

**PUBLIC INTEREST**

■ The Tribes argue that the public interest will be served best by allowing them to sustain jobs on their reservations, and by enabling their members to avoid dependence upon government-provided benefits. The government argues that it is against the public interest to allow violations of the Johnson Act to continue, and that allowing the Tribes to continue operating gambling devices is unfair to those Indian tribes that have complied with the Johnson Act. Although both sides make valid points, the Tribes' position is the stronger of the two.

**CONCLUSION**

If it is debatable whether the Tribes will succeed on appeal, it cannot be disputed that their cases raise significant questions of law. Since the balance of hardships tips sharply in their favor, a stay is appropriate. *Cf. Tribal Village of Akutan v. Hodel,* 859 F.2d 662, 663 (9th Cir.1988) (in deciding whether to stay an injunction, one of the tests is whether the moving party has demonstrated that serious questions are raised and the balance of hardships tips sharply in its favor).[6]

**IT IS HEREBY ORDERED:**

1. The Tribes' motions[7] are granted to the extent indicated above.

2. The Tribes need not surrender the defendant machines to the government while their appeals are pending.

---

**5.** Even if the government has a duty to bring an IGRA action against the State of Washington, that duty would not preclude the government from seeking forfeiture of gambling devices that are being operated in violation of the Johnson Act.

**6.** The criteria set forth in *Tribal Village of Akutan* are consistent with the traditional Rule 62(c) criteria.

**7.** In CS–98–264–FVS, the motion is court record number 54. In CS–98–265–FVS, the motion is court record number 41.

3. The Tribes are to seek expedited appellate review of the Court's orders granting forfeiture.

4. While their cases are on appeal, the Tribes are to explore alternative means of resolving their disputes with the State of Washington.

5. The Tribes are to submit written reports every sixty (60) days concerning the status of these cases and their efforts to resolve them.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this Order and furnish copies to counsel.